NUMBER 13-10-00234-CR

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT
OF TEXAS

 

CORPUS CHRISTI – EDINBURG

                                                                                                                             

 

SHIRLEY PERSONS PIGOTT,                                                    Appellant,

 

v.

 

THE STATE OF TEXAS,                                                               
Appellee.

                                                                                                                             

 

On appeal from the 329th District Court

of Wharton County, Texas.

                                                                                                                             

 

MEMORANDUM OPINION

 

Before Justices
Garza, Vela, and Perkes

Memorandum
Opinion by Justice Garza

 

            A jury
convicted appellant, Shirley Persons Pigott, of two counts of evading arrest or
detention with a vehicle, see Tex.
Penal Code Ann. § 38.04(a), (b)(1)(B) (West Supp. 2010), with a deadly
weapon finding on each count.  See id. § 12.35(c)(1)(West Supp. 2010) (enhancing
state-jail-felony offense to third-degree felony if deadly weapon was used or
exhibited during offense or in flight following offense); id. §
1.07(a)(17) (defining deadly weapon).  Appellant was acquitted of aggravated
assault on a public servant.  See id. § 22.02(a)(2), (b)(2)(B) (West
Supp. 2010).  The trial court sentenced appellant to two years’ imprisonment on
each count, with the sentences to run concurrently.  See id. § 12.34(a)
(West Supp. 2010) (providing punishment range for third-degree felony is two to
ten years’ imprisonment).  By nine issues, which we reorganize as five, appellant
contends:  (1) the evidence is insufficient to support the jury’s deadly weapon
findings, and those findings were inconsistent and/or ambiguous; (2) she was
denied a fair trial and was denied due process due to (a) prosecutorial
vindictiveness, (b) improper cross-examination, and (c) improper jury argument;
(3) the trial court failed to reasonably accommodate her disabilities; (4) the
trial court permitted improper cross-examination; and (5) the trial court erred
in denying her “motion for mistrial and for new trial.”  We affirm. 

I.  Background[1]

            On September 29, 2007, State
Trooper Alfred Ochoa stopped appellant for speeding on Highway 59 in Wharton
County, Texas.  Appellant refused to roll down her window, but told Trooper
Ochoa that she was afraid and wanted another officer at the scene.  When
Trooper Ochoa refused to summon another officer, appellant slowly drove away,
with Trooper Ochoa slowly in pursuit.  Trooper Ochoa requested assistance, and
Sergeant Daniel Terronez joined the pursuit.  Traveling in the left-hand lane,
Sergeant Terronez pulled even with appellant’s vehicle as Trooper Ochoa
followed appellant; appellant pulled over to the right shoulder.  However, appellant
continued to refuse to roll down her window, and after the officers attempted
to break a rear window, appellant drove away a second time.  Appellant was initially
speeding, reaching over 100 miles per hour, but then decreased her speed.  She
eventually pulled over, stopped, and was arrested.  

II. 
Deadly Weapon Findings

A.  Standard of
Review 

            By her first
issue, appellant contends the evidence is legally and factually insufficient to
support the jury’s findings that she used her car as a deadly weapon.  

            The court
of criminal appeals has recently held that there is “no meaningful distinction
between the Jackson v. Virginia legal sufficiency standard and the Clewis
factual-sufficiency standard” and that the Jackson standard “is the
only standard that a reviewing court should apply in determining whether the
evidence is sufficient to support each element of a criminal offense that the
State is required to prove beyond a reasonable doubt.”  Brooks v. State,
323 S.W.3d 893, 902-03, 912 (Tex. 2010) (plurality op.).  Accordingly, we
review claims of evidentiary sufficiency under “a rigorous and proper
application of the Jackson standard of review.”  Id. at 906-07,
912.  

            Under the
Jackson standard, “the relevant question is whether, after viewing the
evidence in the light most favorable to the prosecution, any rational trier of
fact could have found the essential elements of the crime beyond a reasonable
doubt.”  Jackson v. Virginia, 443 U.S. 307, 319 (1979); see Brooks,
323 S.W.3d at 898-99 (characterizing the Jackson standard as: 
“Considering all of the evidence in the light most favorable to the verdict,
was a jury rationally justified in finding guilt beyond a reasonable doubt”).

            We
measure the legal sufficiency of the evidence by the elements of the offense as
defined by a hypothetically correct jury charge.  Coleman v. State, 131
S.W.3d 303, 314 (Tex. App.–Corpus Christi 2004, pet. ref’d) (citing Malik v.
State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).  

B.  Law on Deadly
Weapon 

            A deadly
weapon is “anything that in the manner of its use or intended use is capable of
causing death or serious bodily injury.”  Tex.
Penal Code Ann. § 1.07(a)(17)(B) (West Supp. 2010).  To determine
whether the evidence supports a deadly weapon finding in cases involving motor
vehicles, we conduct a two-part analysis.  Foley v. State, 327 S.W.3d
907, 916 (Tex. App.–Corpus Christi 2010, no pet.); Hilburn v. State, 312
S.W.3d 169, 177 (Tex. App.–Fort Worth 2010, no pet.) (citing Sierra v. State,
280 S.W.3d 250, 255 (Tex. Crim. App. 2009)).  We first “evaluate the manner in
which the defendant used the motor vehicle during the felony.”  Sierra,
280 S.W.3d at 255.  We then “consider whether, during the felony, the motor
vehicle was capable of causing death or serious bodily injury.”  Id.

            As to the
first part of the Sierra test—the manner in which the defendant operated
the vehicle—we evaluate whether the defendant’s driving was reckless or
dangerous.  Id.  We consider several factors in examining whether a
defendant’s driving was reckless or dangerous:  (1) intoxication; (2) speeding;
(3) disregarding traffic signs and signals; (4) driving erratically; and (5)
failure to control the vehicle.  Id. at 255-56.

            As to the
second part of the Sierra test, to sustain a finding that the motor
vehicle could cause death or serious bodily injury, there must be evidence that
others were actually endangered.  Foley, 327 S.W.3d at 916
(citing Cates v. State, 102 S.W.3d 735, 738 (Tex. Crim. App. 2003); Drichas
v. State, 219 S.W.3d 471, 476 (Tex. App.–Texarkana 2007, pet. ref’d); Williams
v. State, 946 S.W.2d 432, 435 (Tex. App.–Fort Worth 1997, pet. dism'd)).  A
hypothetical potential for danger is not sufficient.  Id.  Therefore, we
must “examine the record for evidence that there were other motorists present
at the ‘same time and place’ as the reckless driving occurred.”  Id. at
916 (citing Drichas, 219 S.W.3d at 476).  

C.  Discussion

            Because appellant
challenges the sufficiency of the evidence supporting the jury’s deadly weapon
findings, we set forth the witnesses’ testimony relevant to that issue below.  The
State presented two witnesses:  Trooper Ochoa and then-Sergeant Daniel Terronez. 


1.  Trooper Alfred
Ochoa 

            Trooper Ochoa
testified that during the evening hours of September 29, 2007, he observed
appellant’s vehicle speeding northbound in the lefthand lane on Highway 59. 
When his vehicle was behind appellant’s, Trooper Ochoa turned on his overhead
lights.  Instead of pulling over to the right shoulder, appellant pulled over
to the left side of the roadway, onto the grassy median, and stopped.  Trooper
Ochoa pulled over to the right shoulder of the highway and used his bullhorn to
instruct appellant to move to the righthand side of the roadway when it was
safe to do so.  When appellant did not move her vehicle, Trooper Ochoa crossed
the highway and pulled his vehicle behind appellant’s.  Trooper Ochoa approached
appellant’s vehicle and asked her to roll down her window.  Appellant refused
to do so.  Trooper Ochoa was concerned for his safety because he could see
appellant “shuffling” and “messing around” inside the vehicle.  Appellant began
honking her horn and slowly drove away from Trooper Ochoa.  

            Trooper
Ochoa called Sergeant Terronez for assistance.  With Sergeant Terronez’s
assistance, appellant pulled over again, this time on the right shoulder of the
highway.  However, appellant still refused to roll down her window or exit the
vehicle.  With Trooper Ochoa standing in front of appellant’s vehicle, attempting
to block appellant’s exit, appellant nonetheless drove forward, forcing Trooper
Ochoa to move out of the way as appellant re-entered the highway.  Trooper
Ochoa shouted that appellant should not pull out because an 18-wheeler was
rapidly approaching.  Appellant ignored the warning and re-entered the highway. 
Trooper Ochoa feared that appellant’s flight from the officers would likely
result in an accident.  

            Appellant
raced down the highway, quickly reaching a speed in excess of 100 miles per
hour.  After almost losing control of the vehicle, appellant decreased her
speed.  Eventually, she pulled over and was arrested.  By this time, six
officers were involved in the pursuit.  

            On
cross-examination, Trooper Ochoa stated that he did not recall that appellant
displayed her driver’s license through the window and did not recall that she asked
him for identification.  Trooper Ochoa admitted that his report did not state
that appellant hit him with her vehicle when fleeing from the second stop.  Trooper
Ochoa stated that appellant violated the law by pulling over to the left,
rather than to the right, during the first stop.[2] 
Trooper Ochoa stated that during the second stop, he told appellant not to pull
out in front of the 18-wheeler, but she pulled out anyway.  

2.  Lieutenant Daniel
Terronez[3]

            Officer Terronez
testified that, in response to Trooper Ochoa’s request, he encountered Trooper
Ochoa following appellant’s vehicle, at a speed of only ten to fifteen miles
per hour.  Officer Terronez pulled up beside appellant’s vehicle, and she gestured
for him to pull over.  Appellant and Officer Terronez pulled over to the right
shoulder; Officer Terronez parked in front of appellant’s vehicle.  Officer
Terronez said he did not force appellant’s vehicle off the road.  Officer
Terronez believed that when appellant initially motioned to him, she did not
realize he was an officer; however, when he exited his vehicle and she saw his
uniform, she began honking her horn.  Although Officer Terronez asked appellant
to roll down the window, get out of her vehicle, and provide her driver’s
license, she did not do so.  Officer Terronez did not recall appellant showing
her driver’s license at all.  Because appellant refused to cooperate, Officer
Terronez backed his car up to block appellant from leaving the scene.  He decided
to break a window on appellant’s vehicle so she could eventually be forcibly
removed if necessary.  He noted that by this time, appellant had already
committed a felony by fleeing from Trooper Ochoa.           

            Appellant
continued to honk the horn and inch forward, maneuvering between the officers’
vehicles; she eventually forced Trooper Ochoa out of the way and fled a second
time.  Officer Terronez testified that as appellant pulled onto the highway,
the incident could have seriously injured Trooper Ochoa.  During the second
pursuit, Officer Terronez estimated appellant’s top speed at 107 or 108 miles
per hour.  He stated that such speeds presented a risk of bodily injury or
death to others because appellant could have lost control of her vehicle. 
Officer Terronez contacted the Wharton police department and several other
troopers and requested their assistance.  Several officers deployed “Stinger
spikes” across the highway.  Unfortunately, the spikes accidentally disabled a
vehicle in front of appellant’s.  However, when appellant saw the officers on
the side of the road, she pulled over.  

            The defense
presented two witnesses:  Dr. Matthew Brams, appellant’s treating psychiatrist,
and appellant.

3.  Dr. Matthew Brams


            Dr. Brams testified
that he has been treating appellant for three or four years.  Defense counsel
questioned Dr. Brams about his report, in which he answered questions based on
certain assumed facts.  Dr. Brams stated his opinion that a sixty-year-old
woman such as appellant, stopped by an officer at night, could reasonably have believed
that if she opened the door to her vehicle before moving to a public place, she
might be harmed.  Appellant was diagnosed with bipolar disorder and attention
deficit hyperactivity disorder (“ADHD”), and was taking medication for those
conditions.  Dr. Brams explained that because of several recent stressful
situations, he had also diagnosed appellant as suffering from post-traumatic stress
disorder (“PTSD”).  Dr. Brams stated that a person with PSTD is “over-sensitive”
and perceives fear even in the absence of any reason to be fearful.  In
stressful situations, a person with PTSD feels an urgent “need to flee the
perceived danger.”  According to Dr. Brams, if appellant had been given a
reasonable period of time without intimidation or threats during the first
stop, she could have regained her composure.

            On
cross-examination, Dr. Brams stated that in his expert opinion, appellant’s
behavior on the night of her arrest was directly related to her mental
condition.  When asked about the causes of appellant’s stress, Dr. Brams
mentioned (1) appellant’s fight with the Texas Medical Board and the possible
loss of her medical license and (2) her late husband had exhibited signs of
early Alzheimer’s disease.[4] 
      

4.  Appellant

            Appellant testified
that she was traveling in the left lane when she first noticed the officer’s
vehicle behind her with its siren and emergency lights activated.  Because
there was another vehicle in the righthand lane, appellant moved off the road
to the left to let the officer pass by.  Trooper Ochoa stopped on the right
shoulder some distance behind appellant and used his bullhorn to instruct appellant
to move to the right side of the road when it was safe to do so.  Appellant
testified that it was not safe because there was heavy traffic.  According to
appellant, cars were passing by at the rate of twelve per minute, or one every
five seconds.  Finally, Trooper Ochoa “zipped over” and parked behind
appellant’s vehicle.  

            Because
she was confused and fearful, appellant locked her doors.  Appellant stated
that she held her driver’s license up to the window, but Trooper Ochoa only
glanced at it.  Appellant testified that she was shaken up when Trooper Ochoa
asked if she wanted to go to jail that night.  Appellant did not crack her
window because she feared that the electric window switch would open the window
completely.  Appellant asked to see Trooper Ochoa’s identification, but he
refused.  She also asked if he would summon another officer, but he refused. 
She asked permission to go to the next lighted area, but Trooper Ochoa said
“no.”  Appellant asked Trooper Ochoa to follow her to the next lighted area;
she then slowly drove away on the grassy median with her hazard lights flashing. 
When she reached a speed of forty miles per hour, appellant pulled back onto
the highway.  She moved to the right-hand lane, traveling with the flow of
traffic, but below the speed limit.  Appellant believed Trooper Ochoa was
following her to the next lighted area.

            Appellant
noticed that an unmarked vehicle, traveling in the lefthand lane, had pulled up
next to her vehicle.  She felt the vehicle was “too close.”  She realized that
the driver of the second car was also an officer.  Appellant felt the second
officer was also “doing things to aggravate [her]” instead of trying to calm
her down.  Appellant stated that what bothered her the most was that the second
officer “stayed even” with her.  She pulled over because he was would not pass
by and “tried to crowd [her].”  Appellant stated that she became “more and more
anxious” because she felt the officers “should be doing things to calm [her]
down.”  

            After
appellant pulled over the second time, she held her driver’s license up to the
window, but the officers did not pay much attention.  Officer Terronez told
appellant that if she did not open the window, he would break it in.  She
responded that if he did so, she would leave.  Appellant also began honking her
horn to “get somebody’s attention.”  Appellant began moving her vehicle forward
and heard Officer Terronez smashing her window.  As she edged forward,
appellant heard Trooper Ochoa shouting, but it did not register that he was
shouting a warning about the traffic.  With regard to re-entering the highway,
appellant testified that, “barreling down at me was an 18-wheeler.  And that
scared the living daylights out of me.  He turned and I turned, and he came
within a few feet of killing me.”  After that, appellant “floored it”; when she
smelled burning rubber, she noticed she was going 107 miles per hour. 
Appellant slowed down and began looking for a lighted place to stop.  She saw a
place on the left, but decided it was not open, and continued driving.  Eventually,
appellant saw several law-enforcement vehicles with flashing lights, felt it
was safe to stop, and pulled over.

            On
cross-examination, appellant testified that when she fled the second time, “an
18-wheeler almost collided with [her] in [her] lane.”  

5.  Deadly Weapon
Finding on Count Two

            Count one
charged that, using a vehicle as a deadly weapon, appellant intentionally fled from
Alfred Ochoa.  Count two charged that, using a vehicle as a deadly weapon,
appellant intentionally fled from Daniel Terronez.  Although there is
some question as to the scope of events included in count one—discussed more
fully below—Officer Terronez was not present when appellant fled after the
first stop.  Thus, we assume that count two is limited to appellant’s conduct
when she fled from the second stop.

            Appellant
contends that with respect to her actions following the second stop, even though
she “panicked” and “drove over the speed limit for 93 seconds,” “[t]here is no
evidence of actual danger to a person; no evidence that a person was put at
risk of harm from [her] use of her car.”  We disagree.  

            The video
of the incident, which was played for the jury at trial, shows that because
Officer Terronez’s vehicle was parked in front of appellant, appellant was
unable to use the right shoulder to accelerate before entering the right-hand
lane of the highway.  She therefore maneuvered into the lane, attempting to
merge with heavy traffic, from a dead stop.  Appellant’s own testimony
established that when she entered the highway, an 18-wheeler “came within a few
feet” of killing her.  The 18-wheeler can be seen and heard whizzing by in the
video.

            The
entire sequence of events—from the time the video is activated by Trooper
Ochoa’s emergency lights to appellant’s third and final stop when she was
arrested—took place between 8:17 and 8:35 in the evening on Highway 59, a major
highway.  Again, appellant’s own testimony established that the traffic was
heavy and that vehicles were passing by at the rate of one every five seconds. 


            After
entering the highway, Officer Terronez estimated appellant’s speed at 107 or
108 miles per hour.  Appellant admitted speeding at 107 miles per hour and only
slowed down after she “smelled rubber.”  Officer Terronez testified that such
speeds presented a risk of bodily injury or death to others because appellant
could have lost control of her vehicle.  

            Viewing
the evidence in a light most favorable to the prosecution, we conclude that a
rational jury could have determined beyond a reasonable doubt that appellant
used or intended to use her vehicle in a manner capable of causing death or
serious bodily injury.  See Tex.
Penal Code Ann. § 1.07(a)(17); Sierra, 280 S.W.3d at 256 (holding
evidence of deadly weapon legally sufficient when defendant exceeded speed
limit, failed to maintain control of his SUV, and in fact caused serious bodily
injury to another).  We conclude appellant’s driving was reckless or dangerous,
see Sierra, 280 S.W.3d at 255-56, and that there is evidence that others
were actually endangered in the accident.  See Foley, 327 S.W.3d
at 916.  We hold the evidence was legally sufficient to support the jury's deadly
weapon finding as to count two. 

6.  Deadly Weapon
Finding on Count One

            Appellant also
challenges the sufficiency of the evidence supporting the jury’s finding that
she used her vehicle as a deadly weapon as to count one, when she fled from
Trooper Ochoa.  We need not address this issue, however, because even assuming,
as appellant claims, that the evidence is insufficient to support a deadly
weapon finding as to count one, appellant cannot show she was harmed.  

            Appellant
does not challenge the sufficiency of the evidence supporting her conviction
for two counts of evading arrest or detention with a vehicle—only the
sufficiency of the evidence supporting the jury’s deadly weapon finding.  Even
if we assume that the evidence is insufficient to support the deadly weapon
finding as to count one, the consequence is that appellant’s conviction on
count one would be reduced to a state-jail-felony offense instead of a
third-degree felony.  See Tex.
Penal Code Ann. §§ 38.04(a), (b)(1)(B); 12.35(c)(1).  The trial court
imposed the minimum punishment for a third-degree felony—two years’ imprisonment—on
each count, with the sentences to run concurrently.  The penalty range for a
state jail felony without the use of a deadly weapon is 180 days to two
years’ confinement in a state jail, and an optional maximum $10,000 fine.  See
id. § 12.35(a), (b).  We have already affirmed appellant’s conviction as to
count two by determining that the evidence is sufficient to support the jury’s
deadly weapon finding as to that count.  Therefore, appellant must serve the
minimum two-year punishment imposed for count two.  Even if we were to
eliminate the deadly weapon finding as to count one, and appellant’s sentence
as to count one was reduced, any punishment within the punishment range for the
resulting state jail felony is within her two-year sentence for count two.  Accordingly,
the error, if any, is harmless.  

7.  Ambiguity of
Verdict 


            As a
sub-issue, appellant contends that there is “uncertainty” as to the jury’s
verdict because both the State and the defense presented argument that the
deadly-weapon issue as to count one involved the use of the vehicle following
the first stop, and the deadly-weapon issue as to count two involved the use of
the vehicle following the second stop.  Appellant filed a post-conviction
motion for new trial in which she argued, among other things, that the jury’s
deadly weapon finding on count one was “ambiguous and uncertain” and fatally
inconsistent if the jury intended the deadly weapon finding on count one to be
limited only to appellant’s conduct in fleeing from the first stop.  At the
hearing on the motion, appellant’s counsel made the same argument:

            You can’t have—it wouldn’t
make sense for there to be two fleeing questions just because there were two
officers at the second stop.  There were two fleeing issues.  One from the
first stop and then a deadly weapon issue.  That’s the way it was set up. 
That’s the way it was argued. 

 

            Then there was a second
stop, and there was a question whether she fled from the second stop.  And so
the deadly weapon, the jury answered under Count No. 1 that she used a deadly
weapon talking about from the first flee. 

 

            The trial
court stated that it was unnecessary for it to rule on appellant’s argument
that the first stop did not involve the use of a deadly weapon as a matter of
law because the court did not agree “that Count 1 only deals with the first
stop and Count 2 deals only with the second stop.”  The court stated, “I don’t
believe that Count 1 was limited to the first stop.  I don’t believe either
count is specified as whether it was the first stop or the second stop.”

            Appellant’s
“inconsistency” argument is essentially the same as her sufficiency challenge
to the deadly weapon finding as to count one.  We need not address it for the
same reason stated above:  even if the jury limited its consideration of the
deadly weapon finding in count one to the events surrounding the first stop—and
erroneously found the evidence sufficient to support the deadly weapon
finding—appellant cannot show she was harmed.  The trial court came to the same
conclusion, stating:

            Even if I agreed with you
and determined that Count 1 regarded solely the first stop and Count 2 regarded
solely the second stop; and assume further that I were to rule that the first
stop, there was not sufficient evidence of the use of a car in a manner that
would qualify as a deadly weapon.

 

            Even if all of that
happened, your client [appellant] would still have been properly found guilty
under Count 2 of all of the elements necessary to support the verdict in this
case.

 

            And also it would mean
that, again, I’m stuck with the minimum sentence; and your client is not
probation eligible.

 

            We agree with the
trial court.  We overrule appellant’s first issue.  

III.  Denial
of Fair Trial and Due Process 

            By her
second issue, appellant contends she was denied “fundamental fairness” at her
trial due to prosecutorial misconduct or vindictiveness, improper
cross-examination, and improper jury argument.  We address these sub-issues in
turn.  

A.  Prosecutorial
Vindictiveness

            Appellant
contends she was denied “fundamental fairness” and due process because the
district attorney prosecuted her on the aggravated assault charge in
retaliation for allegations she made claiming the DPS officers involved in her
arrest were engaged in illegal conduct.  Appellant made the allegations against
the officers in pro se motions she filed in her criminal case.  

            Appellant
has presented no “clear and concise argument” in support of this contention.  Accordingly,
this sub-issue is inadequately briefed, and appellant has presented nothing for
review.  See Tex. R. App. P. 38.1(i);
Busby v. State, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008).  

            Moreover,
even if appellant had preserved the issue, we find appellant’s complaint to be
without merit.  A presumption of prosecutorial vindictiveness applies only in
limited circumstances, and is not applicable here.  See Neal v. State,
150 S.W.3d 169, 173-75 (Tex. Crim. App. 2004).  When, as here, the presumption
does not apply, 

the defendant may still obtain relief
if he can show actual vindictiveness.  To establish that claim, a defendant
must prove, with objective evidence, that the prosecutor’s charging decision
was a “direct and unjustifiable penalty” that resulted “solely from the
defendant's exercise of a protected legal right.”  Under this prong, the
defendant shoulders the burden of both production and persuasion, unaided by
any legal presumption.  Once again, the trial judge decides the ultimate
factual issue based upon the evidence and credibility determinations.

 

Id. at 174-75 (citations
omitted).  Appellant briefly raised the issue of prosecutorial vindictiveness in
an oral motion for mistrial at the close of evidence.  Appellant’s counsel
argued that the prosecutor deliberately asked appellant questions that were
“unclear,” and as a result, appellant “seiz[ed] up.”  At a hearing on
appellant’s post-conviction motion for new trial, appellant’s counsel testified
that prior to trial, he met with the prosecutor, at which time the prosecutor refused
to dismiss the case and stated that he was going forward with the case to
vindicate the officers that appellant had insulted.  We conclude that even if the
trial court accepted appellant’s counsel’s testimony as true, it does not
establish that the prosecutor’s decision to charge appellant was a “direct and
unjustifiable penalty” that resulted solely from appellant’s exercise of a
protected legal right.  See id.  We hold appellant did not establish a
claim of prosecutorial vindictiveness. 

B.  Improper
Cross-Examination

            Appellant
contends that the district attorney’s cross-examination of her was improper
because it “was crafted for the purpose[s] of taking advantage of [appellant’s]
disability” and to “create stress so that [a]ppellant would appear arrogant and
uncooperative.”  Again, although appellant has provided some record citations
in the “Statement of Facts” section of her brief—but no authorities—she provided
no record citations at all and virtually no “appropriate citation to
authorities” in the “Argument and Authorities” section of her brief.  See Tex. R. App. P. 38.1(i).  Nonetheless, in
the interest of justice, we review the issue.  

Appellant complains
that the prosecutor ignored her “requests for ‘reasonable accommodations’ that
would have allowed her to testify without being dismantled during
cross-examination.”  In her brief, appellant asserts that because of her
disability, she “is unable to process information in a stressful situation.”  She
asserts that “[t]o overcome this problem, Appellant’s attorney attempted to
structure and limit the areas on which Appellant would testify.”  The brief
states:

Appellant submitted a two[-]page
written Summary Statement of Appellant’s testimony concerning the event on the
highway.  Appellant proposed, to the district attorney and the trial court,
that the summary be admitted into evidence; that both sides be limited to
questions about the subject areas in the summary.  Appellant argued that her
disability would prevent her from functioning unless she knew ahead of time the
issues on which she must give testimony.  The district attorney refused to
agree to the request. 

 

            The
record simply does not support appellant’s version of the facts.  After the
State rested, and outside the presence of the jury, appellant’s counsel advised
the court of his plans to present the testimony of Dr. Brams and appellant:

[Appellant’s counsel]:         And
then, Dr. Pigott, I anticipate the same thing, subject to [the prosecutor’s]
agreement or not.  I have—I think I gave you a copy—kind of a summary of her
testimony which I want to ask if this is all her testimony—let her have it to
use as she testifies because that will help keep her calm and structured.  And
then [the prosecutor] can also use it to cross-examine her.

 

And so with those two documents I can
zip in and out of this.  Of course, [the prosecutor] is not going to be
restricted to those documents.

 

[The Court]:                           I
understand.  Do you anticipate we’ll be finishing today?

 

[Appellant’s Counsel]:        I think
we’ll be finished with our testimony this morning.

 

            During
his direct examination of appellant, appellant’s counsel offered the “summary”
into evidence.  The trial court ruled that appellant could use the summary
during her testimony to refresh her recollection, but refused to admit it as
evidence.[5] 
At no time did appellant’s counsel request that the prosecutor’s
cross-examination be restricted to the subjects in the summary.  

            Specifically,
appellant complains that:  (1) the prosecutor asked her questions about
speeding, even though it was undisputed that she was speeding; (2) the
prosecutor called attention to her posture and demeanor by asking her to lean
forward; (3) the prosecutor asked her to explain how her disability was
affecting her testimony; (4) the prosecutor led her to say she believed he
might trick her; and (5) the prosecutor asked questions about her claims of
conspiracy between the DPS and the Texas Medical Board, her conflicts with the
Texas Medical Board, and other topics that were prohibited by the State’s
motion in limine.  Appellant provides no authority supporting her argument that
the prosecutor’s questions were improper.

The record shows that
on numerous occasions, appellant asked the prosecutor to repeat his question so
she would “know exactly” what she was answering.  Appellant also stated that
she was “hyper-vigilant” because she was concerned that the prosecutor was trying
to trick her.  Several times, appellant said she was “not going to keep
answering the same question”; her counsel interrupted on several occasions to
encourage her to “be more willing to answer [the prosecutor’s] questions.”  Although
appellant complains of being questioned about her conflicts with the Texas
Medical Board,[6]
her own counsel questioned her about those issues on direct examination.[7]

Appellant may have
appeared uncooperative and argumentative,[8]
and she may not have been an effective or sympathetic witness.  However, we see
no evidence that she was so confused that she was unable to testify and no
evidence that the prosecutor “leveraged” or took advantage of any alleged
disability.  We conclude that appellant did not establish that she was denied
due process because of improper cross-examination.  Because appellant repeated the
same arguments in her fourth issue, we also overrule her fourth issue.  

In her third issue, appellant makes
the same arguments regarding improper cross-examination, but characterizes the
issue as a denial of “reasonable accommodations” that “would have allowed her
to testify without being dismantled during cross-examination.”  Because we have
concluded that those arguments are without merit, we also overrule appellant’s
third issue.

C.  Improper Jury
Argument

In the third
sub-issue of her second issue, appellant complains that she was denied due
process when the prosecutor engaged in improper jury argument.  Specifically,
appellant complains of the following argument:

[Prosecutor]:              I have a
job under the law to see that justice is done.  Not to be hell-bent on
convictions.

 

Now I will concede in this case, based
on what this defendant did and what she put those officers through, yeah, I’m
hell-bent on a conviction in this case.  But I’m going to do it the right way.

 

            . . . . 

 

I have no idea why the defendant did
what she did.  Was she under some sort of mental influence?  I don’t think
we’ve seen any real credible evidence of that.

 

Was she ticked off?  This cop had the
nerve to stop her and demand that she present her driver’s license, a lowly
police office daring to confront a medical doctor?  You’ve seen her attitude. 
She’s arrogant with me.  What do you think she treated him like?

 

            Appellant
contends that the prosecutor’s argument that “[a]ppellant is arrogant and
uncooperative because she is a medical doctor” is outside the record and is
“inflammatory.”  The State responds that:  (1) appellant waived her complaint
because she did not object at trial to the prosecutor’s jury argument; and (2)
the prosecutor’s statement attributing appellant’s arrogance to her status as a
medical doctor was a reasonable deduction from the evidence.  

“[A] defendant’s
failure to object to a jury argument or to pursue to an adverse ruling his
objection to a jury argument forfeits the right to complain about the argument
on appeal.”  Threadgill v. State, 146 S.W.3d 654, 670 (Tex. Crim. App.
2004); see Adams v. State, No. 13-09-334-CR, 2010 Tex. App. LEXIS 5588,
at *41 (Tex. App.–Corpus Christi July 15, 2010, pet. ref’d) (mem. op., not
designated for publication).  Here, appellant did not object to the jury
argument and has forfeited her right to complain about it on appeal.  Threadgill,
146 S.W.3d at 670.  Having overruled each sub-issue, we overrule appellant’s
second issue.  

IV. 
Denial of Motion for Mistrial

            In
her fifth issue, appellant contends that the trial court erred in denying her “motion
for mistrial and for new trial.”  Appellant listed this issue in the “Errors
Presented” section of her brief, and it appears in the “Summary of Argument”
section as follows:  “The trial court erroneously denied Appellant’s motion for
mistrial, which alleged the series of improper acts by the D.A.”  However, the
issue is not addressed at all in the “Argument and Authorities” section of the
brief.  Accordingly, appellant has presented nothing for review.  See Tex. R. App. P. 38.1(i); Busby,
253 S.W.3d at 673.  As noted above, appellant’s counsel made an oral motion
for mistrial at the close of the evidence, arguing that the prosecutor had
intentionally asked appellant unclear questions, and had “used . . .
[appellant’s] mental disabilities . . . to defeat [her] opportunity to project
herself fairly to the jury.”  We have rejected appellant’s arguments that the
prosecutor acted improperly.   We overrule appellant’s fifth issue.  

V.  Conclusion

            We
affirm the trial court’s judgment.  

________________________

DORI
CONTRERAS GARZA

                                                                                                Justice

 

Do
not Publish. 

Tex. R. App. P.
47.2(b)

Delivered and
filed the 

2nd day
of June, 2011.

 

 

 









[1]
As this is a memorandum opinion and the parties are familiar with the facts, we
will not recite them here except as necessary to advise the parties of the
Court’s decision and the basic reasons for it.  See Tex. R. App. P. 47.4.  





[2]
See Tex. Transp. Code Ann. §
545.156 (West 1999) (“On the immediate approach of an authorized emergency
vehicle using audible and visual signals . . . an operator . . . shall . . .
yield the right-of-way [and] immediately drive to a position parallel to and as
close as possible to the right-hand edge or curb of the roadway . . . .”).

 





[3]
At the time of the events at issue, Officer Terronez was a Sergeant with
Department of Public Safety, but had been promoted by the time of trial. 





[4]
Appellant’s husband was alive the night appellant was arrested, but by the time
of trial, had committed suicide.  





[5]
We note that despite the trial court’s ruling, the summary is included in the
record as Defense Exhibit 7.

 





[6]
In a pre-trial discussion with the trial court, the prosecutor stated that if
appellant testified, he would question her about statements she made during the
course of the Texas Medical Board hearing, without identifying it as a hearing
before the Texas Medical Board.  Appellant’s counsel said, “That’s fine.”

 





[7]
See Torres v. Danny’s Serv. Co., 266 S.W.3d 485, 487 (Tex. App.–Eastland
2008, pet. denied) (“Texas follows a policy of wide-open cross-examination. . .
. Thus, a witness may be cross-examined on any issue that is probative of her
credibility.  This includes evidence that reflects any impairment or disability
affecting the witness’s credibility.”) (citations omitted).

 





[8]
At one point, during cross-examination, she instructed the prosecutor, “I’m
sorry I have to teach you the law.”